RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0101p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KENAMERICAN RESOURCES, INC.,

*Petitioner*,

*v.*

No. 20-4102

UNITED STATES SECRETARY OF LABOR; MINE SAFETY
AND HEALTH ADMINISTRATION, FEDERAL MINE
SAFETY AND HEALTH REVIEW COMMISSION,

*Respondent*.

Upon Petition for Review from the Federal Mine Safety & Health Administration;
No. KENT 2013-211.

Argued: July 20, 2021

Decided and Filed: May 11, 2022

Before: BOGGS, CLAY, and WHITE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Artemis D. Vamianakis, FABIAN VANCOTT, Salt Lake City, Utah, for Petitioner.
Emily Toler Scott, UNITED STATES DEPARTMENT OF LABOR, Arlington, Virginia, for
Respondent. **ON BRIEF:** Artemis D. Vamianakis, Jason W. Hardin, FABIAN VANCOTT,
Salt Lake City, Utah, for Petitioner. Emily Toler Scott, UNITED STATES DEPARTMENT OF
LABOR, Arlington, Virginia, for Respondent.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.  Petitioner KenAmerican Resources, Inc. challenges an order of the Federal Mine Safety and Health Review Commission upholding a citation issued by the Secretary of Labor.  We DENY the petition for review.

**I.**

The Paradise No. 9 mine is a large underground coal mine located in Muhlenberg County, Kentucky, operated by Petitioner KenAmerican Resources, Inc. ("KenAmerican").  On April 19, 2012, someone filed an anonymous hazard complaint with the Department of Labor's Mine Safety and Health Administration ("MSHA") reporting potentially dangerous conditions at the Paradise No. 9 mine.  The next day, MSHA inspector Doyle Sparks and several other inspectors[1] from the MSHA arrived at the mine to perform an unannounced safety inspection.

The Paradise No. 9 mine has two portals, so the MSHA team split into two groups for the inspection; Sparks and three other inspectors went to the mine's new portal, and two inspectors went to the mine's old portal, located about six miles away.  The mine's dispatcher, Lance Holz, worked in a shack outside the old portal.  Since the MSHA inspectors arrived midway through the evening shift, Holz called for a miner to return to the surface with a mantrip.[2]  The inspectors at the old portal instructed Holz not to tell anyone down in the mine that they were there.

Unbeknownst to Holz, Sparks, who was positioned at the new portal, was monitoring a mine-phone receiver from which he could hear Holz.  While Sparks was listening, an unidentified miner in unit four picked up the receiver and asked Holz, "do we have any company

---

[1]As noted by the ALJ, there is conflicting information in the record regarding the number of inspectors responding to the complaint.  However, the precise number of inspectors is not material to any issue in this appeal.

[2]A mantrip is "a car that carries miners underground."  *Pendley v. Fed. Mine Safety & Health Rev. Comm'n*, 601 F.3d 417, 419 (6th Cir. 2010).

outside?"  App. 107.  According to Sparks, Holz responded, "yeah, I think there is."**3**  App. 108. Sparks then asked the miner to identify himself and received the response, "who is this?"  *Id.* Sparks stated that he was a representative of MSHA and again asked the miner to identify himself, but received no response.  Believing that the unidentified miner was asking Holz whether MSHA was there to conduct an inspection, and believing that Holz's response was an illegal attempt to tip the miner off about MSHA's impending inspection, Sparks issued Citation No. 8502992 to KenAmerican.  The citation accused KenAmerican of providing advance notice of a MSHA inspection to personnel underground, which is a violation of section 103(a) of the Federal Mine Safety and Health Act of 1977 ("Mine Safety Act"), 30 U.S.C. § 813(a).

KenAmerican contested the citation and associated penalty.  An administrative law judge ("ALJ") granted summary judgment to KenAmerican and vacated the citation, finding that the Secretary did not establish a violation of section 103(a) because the conversation between Holz and the unknown miner was ambiguous, and Holz's response did not clearly constitute advance notice of a MSHA inspection.  The Secretary filed a petition for review, and the Commission reversed the ALJ, finding that whether Holz's response constituted advance notice of an inspection was an issue of material fact that precluded summary judgment.  The Commission remanded with instructions to hold a hearing.

At the hearing before the ALJ, Sparks testified that he heard an underground miner ask Holz, "do we have any company outside?" and heard Holz respond, "yeah, I think there is." App. 107–08.  Sparks then asked the miner to identify himself and received no response.  He testified that based on his decades of experience working in the mining industry, he believed that the miner and Holz were using coded language and that Holz's statement provided the miner with advance notice of an MSHA inspection.

Holz's testimony largely corroborated Sparks's recollection of the events at issue, with one exception: Holz confirmed that when he heard the caller ask if there was "company outside" he assumed the caller was asking about MSHA inspectors, but he testified that he responded,

---

**3**During the October 3, 2017 evidentiary hearing before Administrative Law Judge L. Zane Gill, Sparks quoted this line as both "yeah, I think there is" and as "yeah, I think we do."  App. 107–08.  Because the opinions below quoted this phrase as "yeah, I think there is," App. 54; 69, we do the same.

"I don't know[.]"  App. 248.  Holz immediately acknowledged, however, that "it's possible" he said something else.  *Id.* at 247–48.

Following the hearing, the ALJ again ruled in KenAmerican's favor and vacated the citation.  The ALJ credited Holz's claim that he responded "I don't know" over Sparks's testimony that he heard Holz say "I think there is."  The ALJ then concluded that KenAmerican had not provided advance notice of an MSHA inspection.  App. 54–66.

The Secretary appealed the ALJ's second decision, and the Commission again reversed, finding that the ALJ abused his discretion in crediting Holz's testimony over Sparks's testimony,[4] and that KenAmerican had provided advance notice of an inspection in violation of section 103(a)).  The Commission's second decision also rejected KenAmerican's arguments that section 103(a)'s prohibitions do not apply to mine operators and that section 103(a) violates the First Amendment.  The Commission remanded and ordered the ALJ to assess an appropriate penalty.

On remand, the ALJ assessed a penalty of $18,742.  KenAmerican petitioned the Commission for discretionary review, which was denied.  Forty days later, the ALJ's third decision became the final decision of the Commission.  30 U.S.C. § 823(d)(1).

This appeal followed.

## II.

A party aggrieved by an order of the Commission may seek review in this court.  30 U.S.C. § 816(a)(1).  "The standard under which this Court reviews the Commission's order is governed by the Mine Safety Act and general administrative law principles, although the Administrative Procedure Act's judicial review provisions do not apply here, 30 U.S.C. § 956."  *Pendley*, 601 F.3d at 422.

---

[4]KenAmerican does not contest the Commission's reversal of the ALJ's credibility finding in this appeal.  Therefore, we take as fact that Holz said "I think there is" when asked if there was "company outside."  *See supra* note 3 and accompanying text.

**A.**

The Secretary cited KenAmerican for providing advance notice of an MSHA inspection in violation of section 103(a) of the Mine Safety Act.  KenAmerican argued before the Commission that the citation was invalid because section 103(a), by its terms, does not apply to mine operators like KenAmerican.  The Commission rejected KenAmerican's interpretation of section 103(a), finding it "flatly inconsistent" with the plain language of the statute.  App. 73.  KenAmerican contends that the Commission's interpretation is erroneous.

We review the Commission's interpretation of section 103(a) *de novo*.  *Pendley*, 601 F.3d at 423.  When interpreting a statute, our task is to give effect to Congressional intent.  *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940).  If the meaning of the language of the statute is clear, we apply the statute as written.  *Id.* at 543; *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.").

Section 103(a) of the Mine Safety Act states:

Authorized representatives of the Secretary or the Secretary of Health and Human Services shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter.  In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person, except that in carrying out the requirements of clauses (1) and (2) of this subsection, the Secretary of Health and Human Services may give advance notice of inspections.  In carrying out the requirements of clauses (3) and (4) of this subsection, the Secretary shall make inspections of each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year.  The Secretary shall develop guidelines for additional inspections of mines based on criteria including, but not limited to, the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws.  For the purpose of making any inspection or investigation under this

chapter, the Secretary, or the Secretary of Health and Human Services, with respect to fulfilling his responsibilities under this chapter, or any authorized representative of the Secretary or the Secretary of Health and Human Services, shall have a right of entry to, upon, or through any coal or other mine.

30 U.S.C. § 813(a).

KenAmerican advances two textual arguments for its position that Congress did not intend section 103(a) to apply to mine operators. It first argues that the first clause of the second sentence—"[i]n carrying out the requirements of this subsection"—is restrictive, which makes Congress's intent clear: since only the Secretaries of Labor and Health and Human Services carry out the requirements of section 103(a), the second clause in the second sentence—which prohibits providing advance notice of an inspection to "any person"—applies only to the two Secretaries and their representatives. Thus, in KenAmerican's view, section 103(a) does not apply to mine operators.

We are not convinced. To start, the second sentence in section 103(a) is the only sentence written entirely in the passive voice, which indicates that Congress was "focuse[d] on an event that occurs without respect to a specific actor[.]" *Dean v. United States*, 556 U.S. 568, 572 (2009). In this light, although the first clause can be read restrictively with the two Secretaries as the implied actors, it is more reasonably read to identify the context. That is, it is properly read as: "*As the Secretary is* carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person."

We are also unpersuaded by KenAmerican's second textual argument that if Congress truly intended the prohibition to apply to "any person," it would have explicitly made the statutory actor "any person," as it did in section 110(e), which imposes criminal penalties for providing advance notice of an inspection. *See* 30 U.S.C. § 820(e) (establishing criminal penalties for "any person who gives advance notice of any inspection to be conducted under [the Mine Safety Act]"). Maybe. But if Congress intended the Secretary to be the statutory actor in the second sentence—as in every other sentence in section 103(a)—why did Congress not use the same sentence structure  that it did in the rest of section 103(a) ("the Secretary shall," or its converse, "the Secretary shall not")? KenAmerican provides no answer.

Fortunately, any ambiguity on the face of § 813(a) is resolved when we examine the broader text of the Mine Safety Act. We need "not interpret each [sentence] in [the] statute with blinders on, refusing to look at the [sentence's] function within the broader statutory context." *Abramski v. United States*, 573 U.S. 169, 179 n.6 (2014); *see Keen v. Helson*, 930 F.3d 799, 803 (6th Cir. 2019) ("Statutory interpretation is a 'holistic endeavor'—the structure and wording of other parts of [the] statute can help clarify the meaning of an isolated term.") (quoting *United Sav. Assoc. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)); *Nat'l Air Traffic Controllers Assoc. v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011) ("Plain meaning is examined by looking at the language and design of the statute as a whole.") (citation omitted). Here, as its name implies, the Mine Safety Act was enacted to address the "urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm[.]" 30 U.S.C. § 801(c). To that end, Congress tasked the Secretary with promulgating mandatory health and safety standards for the Nation's mines, and "require[d] that each operator of a coal or other mine and every miner in such mine comply with such standards[.]" *Id.* § 801(g)(1)–(2). Congress also emphasized, in the statutory text itself, that "the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of [unsafe] conditions and practices in such mines." *Id.* § 801(e).

To ensure compliance, Congress required the Secretary to perform periodic inspections of each of the Nation's mines, § 813(a), and issue citations for any violations found therein, § 814(a). Congress was concerned enough about the problem of miners being tipped off about impending inspections that it established criminal penalties of "a fine of not more than $1,000 or . . . imprisonment for not more than six months" for "any person who gives advance notice of any inspection . . . conducted" pursuant to the Mine Safety Act. *Id.* § 820(e).

With this broader statutory context in mind, we turn back to the text of section 103(a). Under the Secretary's interpretation, mine operators like KenAmerican are subject to civil penalties under section 104(a) for violating section 103(a). KenAmerican contends that the Secretary's interpretation is wrong because Congress did not intend for section 103(a) to cover mine operators, and instead intended only to prohibit the Secretary and the Secretary's agents

from providing advance notice of their own inspections—so as to ensure the Secretary and his agents do not become too friendly with the miners they regulate. KenAmerican asserts that mine operators are sufficiently deterred from providing advance notice of inspections by section 110(e)'s criminal penalties, and that Congress did not intend that mine operators be subject to civil citations for violating section 103(a).

But KenAmerican's interpretation is unsupported by the text of the Mine Safety Act. Congress saw the advance-notice prohibition as important enough to the statutory scheme to warrant both civil and criminal penalties. 30 U.S.C. §§ 813(a), 820(e). It would be odd for Congress not to have intended the advance-notice prohibition to be enforced against mine operators by civil penalties as well as criminal, especially since the maximum fine associated with the criminal penalty is only $1,000 and Congress determined that "the operators of such mines . . . have the primary responsibility to prevent the existence of [unsafe] conditions and practices in [the] mines." *Id.* §§ 801(e), 820(e).

When two parties offer competing interpretations of a statute, one consistent with the statute's overall structure, and another which would produce an "odd" result, we adopt the former. *See Broad. Music*, *Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 773 (6th Cir. 2005) (avoiding interpretation of statute that would "produce an odd result" where "[n]o statutory language suggests why such a result should occur"). Accordingly, because the Secretary's interpretation is consistent with the overall structure of the Mine Safety Act, and KenAmerican's interpretation would produce odd results, the Commission did not err in rejecting KenAmerican's interpretation of section 103(a).

**B.**

Next, KenAmerican contends that even if section 103(a) applies to mine operators, the Secretary's citation is invalid because Holz's statement to the underground miner did not violate section 103(a). Specifically, KenAmerican argues that although Holz may have informed the miner that MSHA inspectors were on mine property, he did not provide the miner with advance notice *of an impending MSHA inspection*.

The Commission rejected KenAmerican's argument, upholding the Secretary's citation because it found the unidentified miner's question about there being "company outside" to be a "solicit[ation of] advance notice of an MSHA inspection," and Holz's response to be confirmation of an impending MSHA inspection. App. 69, 72–73.

We review the Commission's factual findings deferentially. *Pendley*, 601 F.3d at 422. "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C. § 816(a)(1). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support the Commission's conclusion." *Pendley*, 601 F.3d at 423 (brackets omitted) (quoting *Nat'l Cement Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 27 F.3d 526, 530 (11th Cir. 1994)).

At the hearing, Sparks testified that based on his years of experience as both a miner and an inspector, miners and dispatchers often use coded language to alert underground miners about the presence of MSHA inspectors so that underground miners can conceal or fix violations before inspectors arrive. For example, Sparks testified that a miner may ask a dispatcher "is it raining outside?" on a day they both know to be sunny, or ask whether a particular belt is running when they both know that such a belt does not exist. App. 108–09. Based on a preexisting understanding between the miner and the dispatcher about what a particular response means, the miner is able to learn whether MSHA inspectors are heading into the mine.

Here, the unidentified miner asked Holz if there "[was] company outside," and Holz responded "I think there is." App. 107–10, 180. Holz admitted that he assumed the miner was asking about MSHA inspectors when the miner asked if there was "company" outside.[5] App. 247–49, 256. Further, circumstantial evidence surrounding the exchange gives rise to the inference that Holz's response alerted the miner not only that MSHA was on the premises, but also that MSHA inspectors would soon be entering the mine to perform an inspection.

---

[5]The miner's decision not to identify himself after Sparks asked who was on the line may be further circumstantial evidence that the miner knew he was seeking prohibited advance notice of an inspection from Holz. However, because the miner remains unidentified and was not deposed, we cannot exclude the possibility that the miner never heard Sparks's request to identify himself; it is possible the miner hung up the phone in the "couple seconds" between Holz's response and Sparks's request for identification. *See* App. 252.

Specifically, the mine's rudimentary phone system allowed anyone in the mine to hear Holz calling for mantrips. And the unidentified miner could infer that if Holz was calling for mantrips, it meant that a visitor was waiting to enter the mine. Once Holz confirmed for the miner that MSHA inspectors were present, the miner more likely than not drew the inference that Holz was summoning the mantrips for the MSHA inspectors. The miner, knowing how long it takes someone to get from the surface to his area of the mine, could then approximate how long he had to conceal any violations in his working area before inspectors arrived (should the inspectors be heading to his area of the mine). For example, Sparks testified that it took about thirty-five minutes to get from the surface to the working areas of the mine, and in that amount of time a miner "could hang [ventilation line] curtain . . . . [C]ould roof bolt and maybe do a better job of cleaning up [coal accumulations] before [MSHA inspectors] got there." App. 111–12.

KenAmerican contends that Holz could not have tipped the miner off about MSHA's inspection because Holz did not know why the inspectors wanted to enter the mine that day or where they intended to go. But KenAmerican's interpretation of notice is too narrow. A mine operator need not be privy to the MSHA inspectors' reason for wanting to enter the mine in order to provide advance notice of an inspection. Such an interpretation would effectively eviscerate the prohibition against advance notice as applied to mine operators because MSHA inspectors do not typically disclose their inspection plans to operators ahead of time. As long as a dispatcher like Holz remained ignorant of the MSHA inspectors' reason for requesting mantrips, the dispatcher would be free to notify underground miners when MSHA inspectors entered the mine and keep them apprised in real time as to where the inspectors go inside the mine. Miners would then be able to conceal or fix violations before inspectors arrived in their area and to resume violating the law after inspectors have left—precisely the scenario Congress sought to avoid by incorporating in the Mine Safety Act a warrantless right of entry and a prohibition on advance notice. *See Donovan v. Dewey*, 452 U.S. 594, 603 (1981); *cf. Abramski*, 573 U.S. at 179–80 (rejecting defendant's interpretation of a statute because it "would undermine—indeed, for all important purposes, would virtually repeal—the [law at issue's] core provisions").

KenAmerican also argues that Holz's statement to the miner that "company" was present only confirmed what was almost always true at a large mine like Paradise No. 9: inspectors were on the premises for one reason or another. But if MSHA inspectors were on mine property almost every day, and Holz's statement merely confirmed a fact that was almost always true, it raises the question: why would a miner ask the dispatcher—in coded language, no less—whether MSHA inspectors were present? KenAmerican provides no explanation. And for the reasons explained above, the most plausible explanation is that both Holz and the miner understood that the miner was not really asking whether MSHA inspectors were *somewhere on the premises*, but instead whether MSHA inspectors were *about to enter the mine from the portal to which Holz was calling mantrips*. MSHA inspectors are required under section 104(a) to issue citations for any violations they see, and Holz's answer provided the miner with at least thirty-five minutes of advance notice of MSHA's impending inspection.[6] The Commission therefore did not err in finding that Holz's statement violated section 103(a).[7]

Finally, KenAmerican contends that the Commission erred in upholding the citation because section 103(a) violates the First Amendment. According to KenAmerican, section 103(a) is a content-based restriction on speech that cannot survive strict scrutiny.

---

[6]Of course, we do not know whether MSHA inspectors ultimately inspected the miner's working area on April 20, 2012 since the miner remains unidentified.

[7]In its second decision reversing the ALJ, the Commission stated:

Moreover, the Judge erred in finding no violation on the grounds that the miner might have asked the question for many reasons, such as the need to provide mantrips. He held that Holz's confirmation of visitors was only a violation if Holz intended to convey advance notice. That is incorrect. Advance notice of an inspection is a violation. Proof of intent is not required. *Wake Stone Corp.*, 36 FMSHRC 825, 827 (Apr. 2014). If the effect of the communication is to convey advance notice, then the violation is complete. Here, Holz thought the caller was asking whether MSHA inspectors were on site and Holz's statement informed him that inspectors were present. At that point, the violation occurred.

App. 72–73.

The meaning of this paragraph is unclear. But in light of the ALJ's decision, it appears to be critical of the ALJ's discussion of the many innocent reasons the miner and Holz may have had to ask and answer the question as they did. To the extent this language is meant to convey that there can be a violation when there was no intent to seek or give advance notice, we do not adopt this reasoning. However, we need not remand for further factfinding regarding intent because it is clear that the Commission found as fact that Holz understood that the caller was asking whether MSHA inspectors were present and intended to answer that question, knowing that the inspectors were there to go into the mine and inspect. Had Holz responded in a more ambiguous way, remand may have been necessary.

The Commission rejected KenAmerican's First Amendment argument, finding that even if section 103(a) is a content-based restriction on speech and strict scrutiny applies, section 103(a) does not violate the Constitution because it is "narrowly tailored to allow a meaningful inspection of the mine." App. 74.

We review the Commission's legal interpretations *de novo*. *Pendley*, 601 F.3d at 423. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). On the other hand, a law targeting conduct that only incidentally affects speech "will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 26–27 (2010) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

The parties disagree on which level of scrutiny is appropriate here. KenAmerican contends that section 103(a) is a content-based restriction subject to strict scrutiny. The Secretary argues that section 103(a) is a content-neutral law only incidentally affecting speech, making it subject to intermediate scrutiny. We need not decide whether section 103(a) is subject to strict or intermediate scrutiny because even applying it to the former standard, section 103(a) is narrowly tailored to serve a compelling governmental interest.

The Supreme Court has stated that it is undisputed that "there is a substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines[,]" *Donovan*, 452 U.S. at 602, and KenAmerican does not dispute that section 103(a)'s advance-notice prohibition serves a compelling governmental interest in allowing MSHA to inspect mines where they actually operate. Instead, KenAmerican contends that section 103(a) cannot survive strict scrutiny because it is overbroad. In KenAmerican's view, section 103(a) bars all communication about MSHA inspectors once they are on mine property, and a narrowly tailored rule would only prohibit operators from communicating "where the inspector w[ill] be going [in the mine] or what the inspector might be inspecting . . . in advance." Petitioner's Br. at 43.

But KenAmerican's proposed "narrower" rule would not only be less effective than section 103(a), it would actively undermine the interests the provision is meant to serve. In practice, KenAmerican's rule would allow mine operators to broadly notify miners below ground whenever MSHA inspectors arrive at a mine, so long as the operator does not disclose where in the mine inspectors are headed or what they intend to inspect—easy facts for operators to omit, since they are not normally privy to the minutiae of MSHA's inspection plans. For example, a dispatcher could establish a practice of activating a warning light or siren in the mine whenever MSHA inspectors arrive at a portal. As already discussed, the miners, knowing the layout of the mine and how long it would take MSHA inspectors to reach them from the portals, would then be able to approximate how much time they have to conceal or fix violations before inspectors arrive, should inspectors decide to inspect their working area. Miners would also presumably make an inverse inference: If the dispatcher has not sounded the "MSHA inspector alarm," that means that MSHA inspectors are not in the mine, and miners can operate unsafely without fear that inspectors will unexpectedly arrive and issue a citation. Thus, KenAmerican's proposed "narrower" rule would not only less effectively serve the government's interest in enabling MSHA inspectors to inspect mines as they actually operate, but it would also allow miners and/or operators to more confidently violate the very health and safety rules Congress tasked the Secretary with enforcing.

In sum, section 103(a) prohibits communication that provides advance notice of an MSHA inspection. It does not bar all communication about MSHA, nor prevent discussion of MSHA inspections after they have occurred. KenAmerican failed to demonstrate that there is a less restrictive rule that would effectively serve the government's compelling interests, and the Commission did not err in concluding that section 103(a) is narrowly tailored to allow for meaningful inspection of the Nation's mines.

**III.**

For the reasons set forth above, the petition for review is **DENIED**.