RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0101p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JONES BROTHERS, INC.,

*Petitioner*,

*v.*                                                     No. 21-3498

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION; FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,

*Respondents*.

─────────────────

On Petition for Review from the Federal Mine Safety & Health Administration.
Nos. SE 2016-0218-RM; SE 2016-0219-RM; SE 2016-0246.

Argued: March 15, 2023

Decided and Filed: May 5, 2023[*]

Before: CLAY, McKEAGUE, and STRANCH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Douglas R. Pierce, KING & BALLOW, Nashville, Tennessee, for Petitioner. Jennifer Ann Ledig, UNITED STATES DEPARTMENT OF LABOR, Arlington, Virginia, for Secretary of Labor Respondent. **ON BRIEF:** Douglas R. Pierce, Michael D. Oesterle, Stephen C. Stovall, KING & BALLOW, Nashville, Tennessee, for Petitioner. Erik Vande Stouwe, UNITED STATES DEPARTMENT OF LABOR, Arlington, Virginia, for Secretary of Labor Respondent.

─────────────────

[*]This decision was originally filed as an unpublished opinion on May 5, 2023. The court has now designated the opinion for publication.

---

**OPINION**

---

McKEAGUE, Circuit Judge.   Petitioner Jones Brothers, Inc. appeals a decision by the Federal Mine Safety and Health Review Commission (the "Commission") upholding citations issued against it by the Federal Mine Safety & Health Administration (the "Administration") for violations occurring at a Jones Brothers worksite (the "Site").   Jones Brothers argues that the Administration did not have jurisdiction over the Site under the Mine Act, as the Site was a borrow pit subject instead to the jurisdiction of the Occupational Safety and Health Administration ("OSHA").   The Administrative Law Judge found that the Site did not meet the required criteria of a borrow pit, and the Commission declined to review and thus upheld that decision.   We find that there was substantial evidence upon which the ALJ concluded that at least one borrow pit factor was not met, and thus affirm the decision of the Commission.

## I.

### 1.  Factual Background

Petitioner Jones Brothers, Inc., a Tennessee-based construction company, contracted with the Tennessee Department of Transportation ("TDOT") for a road repair project.   Specifically, TDOT hired Jones Brothers to repair State Route 141 in DeKalb County, which had collapsed. Part of this project involved Jones Brothers obtaining and using 68,615 tons of "graded solid rock" for the bottom layer of the new road.   Graded solid rock, as defined by TDOT, is:

> sound, non-degradable rock with a maximum size of 3' . . . At least 50 percent of the rock shall be uniformly distributed between 1' and 3' in diameter, and no greater than 10 percent shall be less than 2" in diameter, and the material shall be roughly equal dimensional in shape. . . . Thin slabby material will not be accepted, and contractor shall be required to process the material with an acceptable mechanical screening process that produces the required gradation.

TDOT's definition of solid graded rock also requires that the rock reach a certain hardness level.

TDOT contracted to pay Jones Brothers $14.25 per ton of rock, for a total of $977,763.75.   In order to obtain this graded solid rock, Jones Brothers leased an area of land

(theSite) not far from the roadway, paying the property owner $75,282 for the right to extract rock there. Testimony from a Jones Brothers employee indicated that Jones Brothers provided a rock from the Site to TDOT for testing, and that TDOT informed Jones Brothers that the rock met its requirements. That same witness also testified that Jones Brothers performed core drilling at the Site to ensure that the rock met TDOT's requirements and to ensure that the rock went deep enough into the ground.

On or around August 10, 2015, Jones Brothers started preparing the Site. Jones Brothers began by removing overburden—dirt and rocks.[1] Then, Jones Brothers prepped the area to be pattern blasted. Jones Brothers subsequently began its extraction of rock at the Site. This involved pattern blasting the limestone to produce appropriately sized rock pieces, using an excavator bucket to grab properly sized rock, and using a "shaker" or "slotted" bucket with 7"x11" slots cut out to allow debris to fall away. The appropriately sized rocks were hauled off to the road repair site. The Site also served as a waste pit for material from the road repair site.

On April 5, 2016, Administration Inspector Danny Williams visited and inspected the Site and spoke with the Jones Brothers crew. He determined that Jones Brothers had violated several of the Administration's standards and issued seven citations and two orders.

### 2. Procedural History

Proceedings were initiated before the Commission pursuant to section 113(d) of the Mine Act.[2] Administrative Law Judge Margaret Miller ruled that the Site was a mine subject to the Mine Act, and not, as Jones Brothers argued, a "borrow pit," which is not subject to the Administration's jurisdiction. The Commission declined to review the decision, making the ALJ's order final. Brothers appealed, and this Court vacated the decision, finding that ALJ Miller was not constitutionally appointed. *Jones Brothers, Inc. v. Sec'y of Labor*, 898 F.3d 669,

---

[1]Another company cleared trees off the land.

[2] The Commission is an adjudicative agency independent of the Department of Labor and the Administration; it is charged with reviewing the Administration's actions. *See* 30 U.S.C. § 823. The Commission is a respondent in this case, but declined to file a brief, stating that it will "stand on the decision it issued in its adjudicative capacity." App. D. 23. The Secretary of Labor, also a respondent, filed the operative response brief in this case.

672 (6th Cir. 2018). We remanded the case "for fresh proceedings." *Id.* On remand, the Commission assigned the case to ALJ Pricilla Rae. Jones Brothers alleges that Rae indicated to all parties on a telephone conference that she had read ALJ Miller's prior vacated decision; the Secretary of Labor (the "Secretary") does not contest this fact. Jones Brothers subsequently moved for Rae's recusal, arguing that Rae's reading of the prior decision violated this Court's command that Jones Brothers receive fresh proceedings. ALJ Rae denied the motion.

Following a hearing, ALJ Rae held that the Administration had jurisdiction, determining that the Site was a mine, not a borrow pit.[3] She based this holding on findings that Jones Brothers (1) did not only use the Site on a one-time basis or only intermittently; (2) engaged in milling, sizing, and crushing; and (3) did not use the rock more for its use as bulk fill than for its intrinsic qualities. The Commission denied review of ALJ Rae's order on May 17, 2021, making the ALJ order the final order of the Commission. 30 U.S.C. § 823(d). Jones Brothers timely filed a petition for review with this Court. We have jurisdiction to hear appeals from final orders of the Commission. 30 U.S.C. § 816(a)(1).

## II.

Jones Brothers challenges the ALJ's decision on two fronts. First, it argues that the Site is a borrow pit not subject to Administration jurisdiction. Second, it argues that the ALJ violated this Court's prior order mandating that Jones Brothers receive "fresh proceedings." We address and reject each argument in turn.

### 1. Jurisdiction: Was the Site a Borrow Pit or a Mine?

Jones Brothers argues that the Site was a borrow pit, falling under OSHA jurisdiction rather than Administration jurisdiction. Because there is substantial evidence to support the ALJ's finding that the Site was a mine rather than a borrow pit, we affirm the Commission's determination that the Administration had jurisdiction to issue citations regarding the Site.

---

[3] On appeal, Jones Brothers does not challenge the merits of the citations.

*a. Standard of Review*

We review the ALJ's legal conclusions de novo. *North Fork Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 691 F.3d 735, 739 (6th Cir. 2012). We review her findings of fact under the substantial evidence standard, whereby we accept her factual findings as long as they are "supported by substantial evidence on the record considered as a whole." *Kenamerican Res., Inc. v. United States Sec'y of Labor*, 33 F.4th 884, 891 (6th Cir. 2022) (quoting 30 U.S.C. § 816(A)(1)). Substantial evidence is that which a "reasonable mind" would find sufficient to support the factual finding. *Id.* (quoting *Pendley v. Fed. Mine Safety & Health Rev. Comm'n*, 601 F.3d 417, 423 (6th Cir. 2010)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Deference is granted towards the decisions of the Secretary when he "makes choices involving MSHA and OSHA coverage." *Hosea O. Weaver & Sons, Inc.*, 28 FMSHRC 688, 692 (Jul. 2006). This is in part because "[i]n situations where an entity is deemed to be subject to either MSHA or OSHA regulations, the Secretary merely engages in an act of 'adjusting the administrative burdens between [his] various agencies.'" *MSHA v. Jermyn Supply Co.*, LLC, 39 FMSHRC 1472, 1483 (MSHRC 2017) (quoting *Donovan v. Carolina Stalite Co.*, F.2d 1547 (D.C. Cir. 1984)).

Here, as is generally the case, the party asserting jurisdiction (in this matter, the Administration/the Secretary) has the burden of proving that jurisdiction exists. *See Sec'y of Labor Mine Safety And Health Admin. v. Bowman Constr. Co. Inc*, 36 FMSHRC 683, 688 (MSHRC 2014) (Secretary bears the burden of proving Mine Act jurisdiction); *Sec'y of Labor Mine Safety and Health Admin. v. Duquette*, 37 FMSHRC 744, 751 (MSHRC 2015) (same); *Cranesville Aggregate Cos.*, 2016 OSAHRC LEXIS 14, at *65, n.37 (OSHRC 2016) (noting that "[w]hen jurisdiction is challenged by a litigant, the ultimate burden of proof rests upon the one who asserts it rather than the one who challenges it," and citing cases); *cf. Hale v. Morgan Stanley Smith Barney LLC*, 982 F.3d 996, 997 (6th Cir. 2020) ("The party asserting subject-matter jurisdiction bears the burden of establishing that such jurisdiction exists.").

As courts have long acknowledged and applied, the Mine Act's legislative history emphasizes that "coal or other mine" must receive a generous interpretation, with any doubts resolved in favor of jurisdiction:

> The [Senate Committee on Human Resources] notes that there may be a need to resolve jurisdictional conflicts, but it is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possible interpretation, and it is the intent of this Committee that doubts be resolved in favor of inclusion of a facility within the coverage of the Act.

S. Rep. No. 181, 95th Cong., 1st Sess. 1, 14, reprinted in 1977 U.S.C.C.A.N. 3401, 3414. *See also Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 936 (6th Cir. 1997) ("MSHA was intended to provide a "'sweeping definition' of the word 'mine,' encompassing much more than the usual meaning attributed to it.'" (citation omitted)); *Watkins Eng'rs & Constructors*, 24 FMSHRC 669, 675–76 (July 2002).

### b. Background: Mine Act and Interagency Agreement

There is very little precedent regarding borrow pits, and what little there is exists almost entirely within ALJ/Commission decisions. The Mine Act defines a "coal or other mine" as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. . . .

30 U.S.C. § 802(h)(1). In 1979, the Administration and OSHA entered into an Interagency Agreement to differentiate between mines, which fall under the Administration's jurisdiction, and borrow pits, which fall under OSHA jurisdiction. *See* 44 Fed. Reg. at 22828 ("Interagency Agreement"). The Interagency Agreement defined borrow pits as:

> [A]n area of land where the overburden, consisting of unconsolidated rock, glacial debris, other earth material overlying bedrock is extracted from the surface. Extraction occurs on a one-time only basis or only intermittently as need occurs,

for use as fill materials by the extracting party in the form in which it is extracted. No milling is involved, except for the use of a scalping screen to remove large rocks, wood and trash. The material is used by the extracting party more for its bulk than its intrinsic qualities on land which is relatively near the borrow pit.

*Id.* at B(7). Administration interpretive guidelines from 1996 provide further edification:

[I]f earth is being extracted from a pit and is used as fill material in basically the same form as it is extracted the operation is considered to be a "borrow pit." For example, if a landowner has a loader and uses bank run material to fill potholes in a road, low places in the yard, etc., and no milling or processing is involved, except for the use of a scalping screen, the operation is a borrow pit. The scalping screen can be either portable or stationary and is used to remove large rocks, wood or trash. In addition, whether the scalping is located where the material is dug, or whether the user of the material from the pit is the owner of the pit or a purchaser of the material from the pit, does not change the character of the operation, as long as it meets the other criteria.

I, MSHA, U.S. Dept. Of Labor, *Program Policy v. Manual*, Section 4, 1.4-3 (1996).

There are thus five general requirements for a borrow pit: (1) the extracted material must constitute overburden; (2) extraction must be on a one-time basis or intermittent; (3) the extracted material must not be milled, beyond the use of a scalping screen "to remove large rocks, wood and trash"; (4) the extracted material must be used more for its bulk as fill than for the material's intrinsic qualities; and (5) the extraction site must be relatively near the location where the extracted materials will be used. As Jones Brothers admits, and as the ALJ noted, a site must meet all five requirements in order to be considered a borrow pit. *See* App. p. 541 (citing cases). This definition is "very narrow," *MSHA v. The Creator's Stone*, 43 FMSHRC 241, 250 (MSHRC 2021); *see also Jermyn*, 39 FMSHRC at 1492, in contrast to the broad definition of a mine.

Jones Brothers does not argue that the Site does not facially fall into the definition of a mine under the Mine Act—that it was not an "area of land from which minerals are extracted in nonliquid form." Rather, Jones Brothers argues solely that the Site was a borrow pit and thus excepted from the Mine Act under the Interagency Agreement, falling under the jurisdiction of OSHA rather than the Administration. The ALJ determined that the Site was not a borrow pit,

finding that it failed to meet factors 2, 3, and 4.  The ALJ did not address factor 1.**⁴**  We find that there was substantial evidence to at least support the ALJ's conclusions regarding factors 2 and 4, and decline to address the other factors as unnecessary.

### c. Borrow Pit Factor #2: Frequency of Extraction

Under the Interagency Agreement, a borrow pit involves extraction on a "one-time only" or "intermittent[]" basis. B(7).  The ALJ determined that the Site did not meet this criterion, noting that extraction there "occurred up to six days per week over a period of at least several months."  App. p. 542.  The Secretary agrees, alleging that "Jones Brothers mined the State Route 141 quarry six days a week for approximately a year for more than ten hours per day most days."  Respondent's Br. at 22.  In response, Jones Brothers argues that the Site was only used for one job, and that extraction occurred only intermittently, alleging that the Secretary "presented no evidence concerning how many days Jones Brothers operated the pit to obtain material."  Petitioner's Br. at 44–45.

The sparse caselaw on borrow pits does not provide much guidance for interpreting the Agreement's one-time/intermittent requirement.  In *MSHA v. Kerr Enterprises, Inc.*, 26 FMSHRC 953, 957 (MSHRC 2004), "full time continuous extraction" failed to satisfy this requirement.  In *Drillex*, the Commission found that Drillex did not excavate on a one-time or intermittent basis where it "excavated and processed material approximately three times each week" for around eight months.  *MSHA v. Drillex*, 16 FMSHRC 2391, 2395 (MSHRC 1994).  On the other end of the spectrum, the excavation in *Duquette* was found to be intermittent where the parties stipulated that "Duquette transported its screened bulk material off-site sporadically (approximately three times in two years)."  37 FMSHRC at 750.

While the record on this issue is murky, there is substantial evidence (which is, as noted, a relatively low bar) to support the ALJ's conclusion that extraction at the site occurred more often than one-time or intermittently.  Project Manager Hinson testified that, weather permitting, employees worked at the Site up to six days a week.  Inspector Williams testified that he spoke

---

**⁴**The ALJ found that factor 5 (proximity to the work site) was met, and the Secretary does not argue that it was not met.

with Jones Brothers employees during his visit to the Site and learned that their schedule involved a start time of 7:00 am and a typical end time of 5:30 pm. Evidence demonstrated that work to prepare the Site for extraction began August 10, 2015. Hauling rock from the Site to the road repair site began at least by October 21, 2015, indicating that extraction at the Site began earlier. Inspector Williams visited the Site and issued his citations on April 5, 2016, around six months later. During that time, Jones Brothers was working to extract 68,615 tons of stone. Excavator operator Kevin Williams testified that he spent "most of [his] day every day" working at the Site. App. p. 327.

These facts seem to place Jones Brothers' operation somewhere in between continuous, full-time extraction such as that found in *Kerr*, and the very sporadic operation in *Duquette*.[5] The operation here most closely resembles that in *Drillex*, where excavation occurred a comparable amount per week (around three times per week) for a comparable amount of time (around eight months) with a goal of producing a comparable amount of stone (20,000 cubic meters). 16 FMSHRC at 2395. Based on this case law and the record, under the deferential standard owed the ALJ's factual findings, the ALJ was reasonable in drawing the conclusion that Jones Brothers' operation was not intermittent.

Jones Brothers' counterarguments are unavailing. Jones Brothers argues that the Secretary did not provide enough concrete evidence regarding the specific amount of time that Jones Brothers spent on extraction, in light of weather and other stoppages and the fact that the Site was also used as a waste pit. Thus, Jones Brothers argues, the number of days working on the Site cannot be evidence of the number of days of extraction. But it was reasonable for the ALJ to infer that a significant portion of the days Jones Brothers worked at the Site involved extraction, considering the sizable amount of stone Jones Brothers needed to produce under its contract with TDOT. *See Drillex*, 16 FMSHRC at 2395 (company working to produce a comparable amount of stone extracted three times a week for eight months, which was found to be not intermittent). Further, Kevin Williams testified that he spent "most of [his] day every

---

[5]Jones Brothers argues that *Duquette* involved up to twenty-five days of work, marking such a time period as one-time/intermittent. Regardless of the truth of this, it has no bearing on the ALJ's findings, which indicate that Jones Brothers' operation far exceeded twenty-five days.

day" working at the Site, and his job as excavator operator appears to be solely or primarily related to extraction, not waste. App. p. 321, 327 (describing Kevin Williams' job as involving loading blasted rock onto the trucks to take to the road repair site). Jones Brothers produces no contrary evidence concerning the actual amount of extraction that occurred, or the amount of time spent on extraction versus solely on waste work. Although it is, as discussed previously, the Secretary's burden to establish jurisdiction, Jones Brothers' lack of specific evidence regarding extraction time weakens its argument that the ALJ erred in her determination.

Jones Brothers also appears to argue that the operation was "one-time" because it was for one customer and one project. Petitioner's Br. at 44–45. But this is an overbroad conception of "one-time," as evidenced by *Drillex*, which also involved one customer and one project but was found to not be one-time/intermittent. 16 FMSHRC at 2392, 2395.

### d. Borrow Pit Factor #4: Use of Extracted Materials

Additionally, in order for a site to qualify as a borrow pit, the material extracted from the site must be used as fill and "more for its bulk than its intrinsic qualities." Interagency Agreement, B(7). Jones Brothers argues that it merely used the extracted limestone as bulk fill in the road repair project, and not for any intrinsic qualities. The ALJ concluded:

> [T]he graded solid rock was not used solely as bulk, but was instead used more for its intrinsic drainage properties—which were essential for the road repair project Respondent was engaged in. The free-draining and free-flowing nature of graded solid rock is why TDOT created the specification for that material. I find that although Respondent used the graded solid rock in bulk to fill in the roadway, it was selected and used more for its intrinsic properties than as plain bulk fill.

App. p. 542.

There are no clear lines to be drawn from the little precedent on this issue regarding when extracted material is used "more" for its bulk than for any intrinsic quality, though some rough parameters can be inferred. In *Duquette*, the ALJ concluded that material was used more as bulk fill than for its intrinsic qualities because "the bulk material extracted . . . lacks intrinsic value because [it] is not uniquely suitable for a particular purpose that can satisfy market specifications." 37 FMSHRC at 749. This implies that extracted material which is "uniquely

suitable for a particular purpose that can satisfy market specifications" may fail to satisfy the borrow pit standard.  And in *Drillex*, the Commission found that stone which "was not used for its bulk alone but was sized for its intended use as fill" did not meet the borrow pit criteria, implying that sizing material indicates that it is being used for intrinsic properties rather than as bulk fill.  16 FMSHRC at 2395.  This statement also highlights that merely being used as fill does not mean that a material is used more as *bulk* fill than for its intrinsic properties—material used as fill may also be used at the same time for its intrinsic properties.

While this is a difficult question, under the deferential standard owed to the ALJ's findings of fact, substantial evidence supports the ALJ's conclusion that the extracted limestone was used more for its intrinsic properties than for its bulk as fill.  First, TDOT maintained specific requirements for graded solid rock: it had to (1) be of a particular hardness, (2) fall within a particular size range, and (3) be of a particular shape (not thin/slabby).  TDOT required Jones Brothers to perform core drilling to ensure that the rock would meet its specifications.[6] Stephen Wright testified that the graded solid rock requirements were developed by Tennessee so that the rock would be free-draining.  This allows the roads to be sturdier in the face of Tennessee's unique geology, which causes water seepage.  These requirements are "expensive," and Tennessee uses them "more than most other states, but their roads stay there when they do that."  App. p. 464.  Clearly, not any bulk fill would do for this job.  The required rock thus met particular market specifications, raising the strong inference that it was not used more as bulk fill than for its intrinsic qualities.  *See Duquette*, 37 FMSHRC at 749.  While the rock may have been used as fill, and even as bulk fill, that does not mean it was used *more* as bulk fill than for its intrinsic properties.  *Drillex*, 1994 FMSHRC LEXIS at *10.[7]

---

[6]The parties quibble over whether it is difficult or easy to meet TDOT's requirements for graded solid rock.  However, the ease with which suitable rock may be obtained does not change the purpose for which that rock is used, and thus has no bearing on the analysis.

[7]Jones Brothers also points to TDOT representative Ken Flynn's statement that graded solid rock is "primarily used for fill material."  App. p. 71–72.  However, as stated, use as fill material is not the same thing as use as bulk fill material, and does not mean a material is being used more as bulk fill than for its intrinsic properties.  Jones Brothers also points out that Wright agreed at the hearing that the rock was used as bulk fill, which Jones Brothers cites as evidence in its favor.  However, the ALJ sustained an objection to the question as leading, and Wright's subsequent testimony describes solid graded rock as desirable for its intrinsic drainage properties.

Jones Brothers' arguments, while having some merit, fall short of the level necessary to overturn the ALJ's findings.  It is true, as Jones Brothers points out, that testimony from Jones Brothers' employees indicated that they viewed the purpose of the extracted rock as being primarily for bulk fill.  It is also true that Inspector Williams testified that graded solid rock could be obtained from a borrow pit, and that the rock extracted from the site was being "used for its bulk as fill."  App. p. 183, 206.  However, the ALJ was entitled to weigh this (often self-serving) testimony against the contrary evidence and find it lacking.  *Cf. Meyer v. Zeigler Coal Co.*, 894 F.2d 902, 906 (7th Cir. 1990) ("[T]he ALJ was presented with conflicting evidence which he was entitled to resolve."); *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 846 (6th Cir. 1990) ("Because the ALJ was required to evaluate conflicting testimony from two witnesses, his opportunity to observe the demeanor of the witnesses warrants deference to his decision.").  And, as stated, being used in part for bulk fill does not mean that the material is being used as bulk fill *more* than for its intrinsic properties—it may be used for both.[8]  Thus, these statements are not sufficient to overturn the ALJ's findings on this matter under the deferential standard this Court must apply.

Jones Brothers also points to testimony from Jones Brothers bulldozer operator Jimmy Givens that the extracted rock would have been considered "trash" at other quarries, meaning it has no intrinsic value.  But the ALJ reasonably discredited Givens' testimony as not credible.[9]  And regardless, she was entitled to disbelieve this portion of his testimony when presented with

---

[8]Inspector Williams' statements in particular are slightly troubling; however, Inspector Williams is not the Secretary or the Commission, and his opinions are not irrefutable fact.  Further, it is conceivable that graded solid rock used for a different purpose (rather than as the base for a repaired roadway) could be used more as bulk fill than for its intrinsic properties, and thus could be obtained from a borrow pit, meaning that Inspector Williams' comment that graded solid rock can be obtained from a borrow pit is irrelevant.

[9]This Court may only set aside credibility determinations made by an ALJ where it finds those determinations to be "inherently incredible or patently unreasonable."  *Mt. States Contrs., LLC v. Perez*, 825 F.3d 274, 282 (6th Cir. 2016) (quoting *Absolute Roofing & Constr. v. Sec'y of Labor*, 580 Fed. App'x. 357, 360 (6th Cir. 2014)).  The ALJ found bulldozer operator Jimmy Givens not credible, stating: "Bulldozer operator Jimmy Givens agreed with counsel for Respondent's comparison that 'what the quarries considered trash is what you guys were using . . . as the bulk fill material.'  However, on cross-examination, Givens stated that graded solid rock 'is usually anything over [two feet] in diameter,' which highlights his lack of knowledge regarding TDOT's requirements for graded solid rock.  Further, Givens agreed that he was 'not someone who was spending much time' at the excavation site."  App. pp. 535–36 (internal citations omitted).  Givens' incorrect statement about the size of graded solid rock, and his admission that he did not spend a lot of time at the Site, were reasonable bases upon which the ALJ found him not credible.

contrary evidence—i.e., she was entitled to view the fact that TDOT required testing to make sure the rock complied with specific standards, and was willing to pay a hefty fee for the rock, as convincing evidence that the rock was not "trash" without intrinsic value in this context.

Further, Jones Brothers' argument that the contract itself referred to the stone as "borrow excavation," and that Tennessee defines graded solid rock under the category of "borrow excavation," Petitioner's Br. at 40–41, is not determinative. The Secretary and the Commission, along with the courts, determine the meaning of borrow material in the context of the Interagency Agreement and the Mine Act, not unrelated states or their agencies.

Overall, the evidence on this point was mixed, but there was enough evidence supporting the ALJ's conclusion on this issue that it was reasonable and satisfies the substantial evidence standard.

### e. Prior Enforcement

Finally, Jones Brothers makes what appears to be a reliance argument, though it cites to no case law on the topic. It argues generally that "similar borrow pits for road repairs have not been subjected to MSHA jurisdiction" and that "[o]ver at least a dozen times Jones Brothers has extracted graded solid rock from a borrow pit," Petitioner's Br. at 46, concluding that "Jones Brothers should be entitled to rely on this precedent," Reply Br. at 24. Jones Brothers notes that at the hearing its president Martin McCulloch "pointed out several similar pits in Tennessee where he worked over many years and was not advised by MSHA that the borrow pit was a mine." Petitioner's Br. at 46. These allegations might provide some persuasive weight. But the prior informal activities of the Administration (which were not apparently brought before the Commission, and are not apparently codified in any manual or interpretive guideline), and the perceptions of people in the industry, are not enough to overcome the explicit terms of the Interagency Agreement, the expressed views of the Secretary and the Commission, and the (albeit sparse) precedent on this issue.

Lax or inconsistent enforcement in the past—especially where, as here, it is ostensibly easy to escape the Administration's notice by declining to inform it of one's activities—does not on its own constitute binding legal authority to justify deviation from the Agreement and

precedent, and Jones Brothers points to no case law stating that it is.   As the Supreme Court stated in a similar situation:

> It is pointed out that until the present proceeding neither the United States Maritime Commission nor its predecessor, the United States Shipping Board, attempted to exercise jurisdiction over forwarders such as the appellees. . . .   It is not to be inferred however that either of those bodies held the view that they were without such jurisdiction or that, if either did, that fact would be conclusive.   An administrative agency is not ordinarily under an obligation immediately to test the limits of its jurisdiction.   It may await an appropriate opportunity or clear need for doing so.   It may also be mistaken as to the scope of its authority. . . .   Although failure to exercise power may be significant as a factor shedding light on whether it has been conferred, . . . that fact alone neither extinguishes power granted nor establishes that the agency to which it is given regards itself as impotent.

*United States v. Am. Union Transp., Inc.*, 327 U.S. 437, 454 n.18 (1946); *cf. Reich v. Manganas*, 70 F.3d 434, 437 (6th Cir. 1995) (noting that even "[i]nternal operating manuals . . . do not carry the force of law, bind the agency, or confer rights upon the regulated entity"); *Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) ("[T]he mere failure of administrative agencies to act is in no sense a binding administrative interpretation that the Government lacks the authority to act." (citation and internal quotation marks omitted)); *NASD v. SEC*, 431 F.3d 803, 811 (D.C. 2005) (noting that while it is "noteworthy" if an agency's past practices conflict with its current view, "we are not legally bound by [an agency's] past practices").   And the Administration does not have jurisdictional discretion, but rather is required under the Mine Act to exercise jurisdiction over all mines.   *Kerr*, 26 FMSHRC at 957.   Thus, this argument fails.

### f.  Conclusion

Deference is owed to the Secretary in this area, and deference is again owed to the ALJ's factual findings in this case.   Under that standard, and in light of the case law and the facts in the record, we conclude that there was substantial evidence to support the ALJ's conclusion that the Site failed to meet the borrow pit requirements to (1) extract on a one-time or intermittent basis and (2) extract material for use more as bulk fill than for its intrinsic qualities.   Because failure to meet any one of the criteria is fatal to Jones Brothers' argument that the Site was a borrow pit, we find that the Site was a mine subject to Administration jurisdiction.

**2. "Fresh Proceedings"**

Finally, Jones Brothers argues that the fact that ALJ Rae read the prior, vacated ALJ decision on this matter violated this Court's directive in its previous opinion, *Jones Brothers, Inc. v. Sec'y of Lab.*, 898 F.3d 669 (6th Cir. 2018), that the case be given "fresh proceedings," *id.* at 672.  This Court did not define "fresh proceedings" in that opinion.  We conclude that this mandate was not violated.

We addressed this general issue quite recently, in *Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022).  There, we noted that an Appointments Clause violation is typically remedied by "a new hearing before a properly appointed official distinct from the previous ALJ." *Id.* at 320 (quoting *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018)) (internal quotation marks omitted).  But we noted that *Lucia* does not give specifics regarding what a "new hearing" entails beyond the need for a new adjudicator, and we emphasized that agencies have wiggle room in shaping the new proceedings on remand.  *Id.* at 320–22.  We stated:

> To hold that all adjudications must start from zero after a judicial decision invalidating ALJ appointments would result in cumbersome, repetitive processes throughout the executive branch simply to produce findings and orders that would often be identical the second time around. . . . [A]n "independent evaluation of the merits" does not require an ALJ to ignore all past proceedings: Independence is not a synonym for ignorance.

*Id.* at 321 (quoting *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d. 111, 121-23 (D.C. Cir. 2015)).  This Court found that the analysis should focus on whether the new ALJ's consideration of elements of the prior vacated proceeding "showed sufficient continuing taint arising from the first [proceeding] to demonstrate that the second proceeding was not 'an independent, de novo decision.'" *Id.* (quoting *Intercollegiate Broad Sys., Inc.*, 796 F.3d at 321).  We concluded that such a taint had not been demonstrated in that case, even though the new ALJ relied on the record of, and stipulations made in, the prior proceeding.  *Id.* at 322–23.

Jones Brothers has not demonstrated a sufficient "continuing taint" in this case.  The only concrete evidence it points to is the fact that ALJ Rae read the previous decision.  But, as stated, this Court does not "require an ALJ to *ignore* all past proceedings." *Calcutt*, 37 F. 4th at 321. Under *Calcutt*, the mere fact that an ALJ read the prior vacated decision is not enough to require

reversal. *Cf. Integrity Advance, LLC v. Consumer Fin. Prot. Bureau*, 48 F.4th 1161, 1171 (10th Cir. 2022) (finding that de novo review by a new ALJ of a previous hearing held before an unconstitutionally appointed ALJ constituted a sufficient "new hearing"); *Doolin Sec. Sav. Bank v. Off. of Thrift Supervision*, 139 F.3d 203, 213 (D.C. 1998) (finding that an acting agency director's affirmance of an ALJ decision, which was based on a Notice of Charges issued by a potentially unlawfully appointed former acting agency director, was sufficiently independent of the Notice, stating: "We have no doubt that Director Retsinas made a detached and considered judgment in deciding the merits against the Bank. Rather than simply writing a letter or a memorandum adopting the Notice of Charges as his own, he acted in the normal course of agency adjudication.").

And Jones Brothers does not allege that ALJ Rae stated that she was influenced by the vacated decision in her own decision-making; indeed, Jones Brothers moved for recusal on the sole basis of her having read the prior decision before she even issued her own decision. The only other argument Jones Brothers makes on this front is that the ALJ's supposedly erroneous conclusions in her order evidence bias from her reading the vacated order. Petitioner's Br. at 49. But the mere fact that the ALJ came to conclusions that Jones Brothers disagrees with does not compel the conclusion that the alleged errors stemmed from bias. ALJ Rae's conclusions were not so unreasonable that the only possible conclusion is that she was "unable to independently consider the merits of [Jones Brothers'] case." *Calcutt*, 37 F. 4th at 323. We therefore reject Jones Brothers' challenge based on a lack of "fresh proceedings."

**III.**

For the reasons stated above, we AFFIRM the order of the Federal Mine Safety and Health Review Commission.